**Not for Publication**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JAMIE WILLIAMS, *individually, and as administratrix ad prosequendum for the* ESTATE OF PETER LEE WILLIAMS, DECEASED, and MAUREEN WILLIAMS, *individually,*<br><br>    *Plaintiffs,*<br><br>  v.<br><br>GEORGE PONIK, RALPH SCIANNI, CITY OF BAYONNE, BAYONNE POLICE DEPARTMENT, JOHN DOE POLICE OFFICER 1-10, *individually, and in their official capacities,*<br><br>    *Defendants.* | Civil Action No. 15-1050 (JMV) (JBC)<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

   This case arises out of Bayonne Police Officer George Ponik's use of pepper spray in a crowded vestibule and the subsequent death of Peter Lee Williams, who was present at the scene. Plaintiff Jamie Williams, Peter's wife, both individually and as administratrix ad prosequendum for the estate of her husband, brings this action with Maureen Williams, their daughter, against Officer Ponik, the City of Bayonne, the Bayonne Police Department ("BPD"), former BPD Chief Ralph Scianni, and Bayonne Police Officers John Does 1-10, both in their individual and official capacities. Three motions are currently pending: (1) Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, D.E. 59; (2) Defendants' motion in limine pursuant to Federal Rule of Evidence 702, D.E. 61; and (3) Plaintiffs' motion in limine pursuant to Federal

Rule of Evidence 702, D.E. 70. The Court reviewed all submissions,[1] and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Defendants' motion for summary judgment is granted, and both Plaintiffs' and Defendants' motions in limine are denied as moot.

## I. BACKGROUND[2]

Peter Lee Williams died on June 10, 2014, at the age of 51. FAC ¶ 1. Plaintiff Jamie Williams is his wife and surviving heir at law. *Id.* She was appointed administratrix ad prosequendum of his estate on June 24, 2014. *Id.* ¶ 2. Plaintiff Maureen Williams is the daughter of the Peter and Jamie. *Id.* ¶ 3.

At the time of the incident, described further below, Defendant George Ponik was a police officer in the BPD, having been on the force for over eighteen years. Def. SOMF ¶ 41. Prior to BPD, Ponik graduated from the Morris County Police Academy, where he completed training in the New Jersey Attorney General Use of Force Guidelines including the use of Oleoresin Capsicum ("OC") spray (or "pepper spray"). *Id.* ¶¶ 44, 45. Since joining the BPD, Ponik has completed bi-annual classroom training sessions, led by a captain or lieutenant from the Planning and Training Unit, on the use of force and weapons, including pepper spray. *Id.* ¶¶ 46-49. The weapon-specific sessions consisted of several hours each. *Id.* ¶ 49. He has not had any other internal affairs complaints for excessive force, false arrest, or false imprisonment outside of the

---

[1] Defendants' brief in support of their motion for summary judgment is referred to as "Def. Br.," D.E. 60; Plaintiffs' opposition is referred to as "Pl. Opp'n," D.E. 69-20; and Defendants' reply is referred to as "Def. Reply," D.E. 78.

[2] The Court cites to Plaintiffs' First Amended Complaint ("FAC"), D.E. 26, and Defendants' statement of material facts ("Def. SOMF"), D.E. 60-1, to the extent that the facts are not in dispute. The Court also cites to Plaintiffs' response and supplemental statement of facts ("Pl. RESP and Supp. SOMF"), D.E. 69-21, and Defendants' response to Plaintiff's supplemental statement of facts ("Def. Supp. RESP"), D.E. 78-1, when necessary.

present incident. *Id.* ¶¶ 55-57. Ponik only used force three other times from July1, 2011 to June 30, 2014, including pepper spray during a June 10, 2014 incident. *Id.* ¶¶ 55-57.

At the time of the incident, Defendant Sciannai was the Chief of Police of the BPD. *Id.* ¶ 58. He was not present at the time of the incident. *Id.* However, under his direction, the BPD maintained a pepper spray use policy, entitled "Use of Oleoresin Capsicum Spray" (the "BPD Policy"). *Id.* ¶ 51. Under this BPD Policy, use of pepper spray is preferred over physical use of force as a means to reduce the risk of injury to civilians and police in confrontation and arrest situations. *Id.* ¶ 51. The BPD Policy states that the purpose of pepper spray use is "to direct, disorient, disperse, and/or temporarily disable an actor or actors." *Id.* ¶ 52.

On June 10, 2013, at approximately 4:23 PM, a physical altercation took place between Plaintiff Maureen Williams and another high school female in the vestibule at 403 Avenue C, Bayonne, New Jersey. Def. SOMF ¶ 1. Peter was present during the altercation. *Id.* ¶ 2. Defendant Ponik arrived on scene, in a police uniform consisting of shorts and a collared shirt, in response to "multiple calls of a large fight." *Id.* ¶¶ 4, 9; Pl. RESP ¶ 9. Upon arriving, Officer Ponik observed approximately 20-30 people engaged in several altercations, including approximately a dozen individuals actively fighting inside the vestibule. Def. SOMF ¶ 5.

There is a video recording of the incident but no audio. *See* D.E. 59-2. Moreover, the images are choppy and not fluid. *Id.* The Court reviewed the video. The following times are taken from the video (not the time of day), which is over sixteen minutes long, and are approximates due to the choppy nature of the images.

The video image is from inside the vestibule facing the street. *Id.* There are two doors (which both open to create a larger entrance) to the entranceway, with the door on the right open when the video begins. *Id.* All participants appear to be, as Plaintiffs' claim, high-school age with

the exception of two: a man with a hat (identified as the Peter, D.E. 60-3 at 2) and a man with a beard. D.E. 59-2. At 1:38 on the video recorder, two females enter the vestibule followed, in rather quick succession, by another female (identified as Maureen Williams, D.E. 60-3 at 2), then a male with a hat (identified as Peter, D.E. 60-3 at 2), a female, two additional males, a female, then another female, then another male (who appears to be holding a phone as if taking a picture or video). D.E. 59-2.

At 1:55 there is some touching or grabbing by the occupants, but there is also some activity occurring at the bottom left of the screen out of the camera's view. *Id.* At 1:58, one of the males (not Peter), wearing a backpack, appears to usher a female out of the doors. *Id.* At 2:00, one of the females appears to be yelling or speaking loudly. *Id.* At 2:02, one of the males with a backpack appears to close the door that was originally open. *Id.* Three additional males then enter, at least one of which who was not previously inside - the male with the beard. *Id.* At 2:20, there appears to be some pushing by Peter and one of the males with a backpack puts his hands up (not in an aggressive fashion but more akin to disengaging). *Id.* There then appears to be shoving and pushing among several males and females, including Peter. *Id.*

At 2:36, Officer Ponik can be seen outside the vestibule, with at least one door partially open. *Id.* At 2:41, Ponik enters the vestibule in what appears to be a police uniform polo shirt with a police insignia. *Id.* Upon entering the vestibule, Officer Ponik attests that he shouted commands such as, "Stop it. Stop it. Everybody stop." Def. SOMF ¶ 10. On the video, Officer Ponik appears to say something upon entering. D.E. 59-2. At 2:44, Officer Ponik sprays what is later identified as pepper spray from a can. *Id.* Officer Ponik claims that this was a two-second burst, Def. SOMF ¶ 11, which appears accurate. Officer Ponik sprays over the occupants' heads, although the spray may have directly hit the man with the beard, who is at the left of the screen

4

(not the Peter or Maureen). D.E. 59-2. When Ponik uses the spray, Peter is at the right of the screen and it does not appear that the spray went over his head. *Id.* Peter was not directly hit by the spray. *Id.*

After releasing the pepper spray, Ponik walks further into the vestibule, out of the doorway, and the occupants start to leave immediately. *Id.* Peter shows no signs of distress at this time. *Id.* One younger male with a backpack does not leave immediately and bends over a few times. *Id.* It is not clear from the video whether the male is in distress or whether he is bending over to pick up items that had fallen to the floor. At 4:19, the male with the beard leaves the vestibule (he later reenters at 4:52 followed by another male) and the male with the beard does not appear to be in distress. *Id.*

At 4:45, a different police officer in uniform enters the vestibule. *Id.* At this point, the doors to the vestibule are shut. *Id.* It appears that at least two officers are standing outside the door with another person who, based on other evidence, appears to be Peter. *Id.* All officers appear to be in uniform. *Id.* At 5:22, a person outside the vestibule on the street appears to fall to the ground – again, based on later evidence, this appears to be Peter. *Id.* Several officers come to the Peter attention once he falls. *Id.*

At 5:42, one officer kneels over Peter. *Id.* This officer for the most part remains kneeled over Peter until a stretcher later arrives. *Id.* The officer may be administering some type of aid to Peter although it is not entirely clear. *Id.* At 7:29, the officer who originally knelt over the Peter goes to both knees. *Id.* Again, the officer may be administering some type of aid but it is not entirely clear. *Id.* At 7:59, an additional officer kneels over Peter and may also be administering some type of aid although it is not clear. *Id.* There may also be a third officer assisting Peter but the camera's vantage point is somewhat blocked by another officer. *Id.* At 8:35, a third (or

possibly fourth) officer kneels over Peter and is apparently attending to him. *Id.* At 9:40, a stretcher arrives. *Id.* At 10:40, Peter is placed on the stretcher, secured, and wheeled away. *Id.*

According to Officer Ponik's incident report, he did not wait for backup to enter the vestibule because he is not required to do so; Ponik entered the vestibule in order to stop the ongoing fight and to prevent any further serious injuries. Ponik testified that based on his observation of the amount of people at the scene, and their lack of response to his verbal commands, his best course of action was to use pepper spray, not physical force. Def. SOMF ¶¶ 14, 15. Ponik later indicated that the two second burst, aimed above the heads of individuals, is consistent with the training he received, as it was not a "full tactical deployment" whereby he would have used the spray directly into the eyes, brow, or forehead of individuals. *Id.* ¶¶ 17-19. Maureen Williams stated that she did not know Ponik was present in the vestibule until after he deployed the pepper spray. *Id.* ¶ 16.

As noted, after Ponik used the spray, the individuals in the vestibule exited onto the sidewalk in front of 403 Avenue C. *Id.* ¶ 23. As indicated by Officer Ponik's report, Peter then began telling Ponik and Sergeant Donovan that his daughter was involved in the incident. *Id.* ¶ 25. Peter then fell to the ground, striking the back of his head on the sidewalk. *Id.* ¶ 27. The officers present attended to Peter and dispatched an ambulance. *Id.* ¶ 28. Ponik and Donovan checked Peter's pulse, then Donovan began chest compression while Ponik retrieved a defibrillator unit from his patrol vehicle. *Id.* ¶ 29. Ponik placed defibrillator pads on Peter's chest but did not administer a shock because the police detected Peter's pulse. *Id.* ¶ 30. Donovan continued chest compressions until an ambulance arrived. *Id.* ¶ 31. Peter later died at the hospital. *Id.* ¶ 32.

The Final Autopsy Report for Peter Lee Williams stated that the manner of death was "natural," and identified the cause of death as severe coronary disease due to atherosclerotic and

hypertensive cardiovascular disease, with cocaine use and mild obesity as contributory causes. *Id.* ¶ 34. The parties dispute whether the pepper spray was a contributing factor to Peter Lee Williams' death. *Id.* ¶ 36; Pl. RESP ¶ 36.[3]

## II. PROCEDURAL HISTORY

Plaintiffs filed their Complaint on February 9, 2015, alleging thirteen causes of action: (I) a 42 U.S.C. § 1983 ("Section 1983") excessive force claim against all Defendants; (II) Section 1983 false arrest and false imprisonment claim against all Defendants; (III) a Section 1983 conspiracy claim against all Defendants; (IV) a Section 1983 *Monell* liability claim against Bayonne, BPD, and BPD Chief Drew Niecrasz in his official capacity; (V) a New Jersey Civil Rights Act ("NJCRA") claim against all Defendants; (VI) an assault and battery claim against Ponik; (VII) a false arrest and imprisonment claim against all Defendants; (VIII) a negligence claim against all Defendants; (IX) a gross negligence claim against all Defendants; (X) a wrongful death claim against all Defendants; (XI) a personal injury and survival action claim on behalf of the Peter as to all Defendants; (XII) an intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED") claim against all Defendants; and (XIII) a loss of consortium claim against all Defendants. D.E. 1. Defendants answered on April 28, 2015. D.E. 7. Plaintiffs moved to strike a number of Defendants' affirmative defenses. D.E. 9. On December

---

[3] Defendants further note that the Hudson County Prosecutor's office reviewed the incident, determined that a criminal review of Ponik's use of force was unwarranted, and referred the matter to the BPD for administrative review. *Id.* ¶¶ 37, 38. The BPD Internal Affairs Unit similarly reviewed the incident and concluded that Officer Ponik's use of force in deploying pepper spray was "legal, just, and proper within the use of force guidelines and department procedure." *Id.* ¶ 39. Defendants, however, have not explained the legal basis for the Court to consider the findings of the prosecutor's office or internal affairs. As a result, the Court does not consider them for purposes of the current motion.

10, 2015, Judge Cecchi granted the motion in part, striking Defendants' statute of limitations and laches affirmative defenses, and denied the remainder of the motion. D.E. 20, 21.

Plaintiffs filed an Amended Complaint on February 19, 2016, alleging the same thirteen causes of action, but (1) substituting Ralph Scianni for Drew Niecrasz (as the correct BPD Chief of Police at the time of the incident), and (2) changing Plaintiff Maureen Williams's legal designation from minor to adult (as she had since reached the age of majority). D.E. 26. Defendants answered the Amended Complaint on May 26, 2015. D.E. 34. Judge Clark ordered that fact discovery be completed by July 31, 2017 and expert discovery by December 31, 2017. D.E. 47, 54. The current motions followed discovery.

## III. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## IV. ANALYSIS

At the outset, Plaintiffs agreed to dismiss their third and sixth causes of action: conspiracy as to all Defendants (Count III), and assault and battery as to Ponik (Count VI). Pl. Opp'n at 29. The Court therefore dismisses Counts III and VI with prejudice.

Next, Defendants argue that BPD must be dismissed as an arm of the municipality. Def. Br. at 30. In their brief, Plaintiffs do not oppose this assertion. Plaintiffs sued both the BPD and City. TAC ¶¶ 6-7. Administrative arms of a municipality such as police departments and the municipality itself are treated as a single entity for purposes of § 1983. *Bonenberger v. Plymouth*

*Twp.*, 132 F.3d 20, 29 n.4 (3d Cir. 1997) ("As in past cases, we treat the municipality and its police department as a single entity for purposes of section 1983 liability."). Therefore, "[p]olice departments cannot be sued alongside municipalities [under Section 1983] because a police department is merely an administrative arm of the municipality itself." *Hernandez v. Borough of Palisades Park Police Dep't*, 58 F. App'x 909, 912 (3d Cir. 2003).

Additionally, "[i]n New Jersey, a municipal police department is not an entity separate from the municipality," because a municipal police department is "'an executive and enforcement function of municipal government.'" *Gaines v. Gloucester City Police Dep't*, No. 08-3879, 2010 WL 760511, at *8 (D.N.J. Mar. 3, 2010) (quoting N.J.S.A. § 40A:14-118). Therefore, police departments also cannot be sued alongside municipalities for claims brought pursuant to New Jersey state law. *Castoran v. Pollak*, No. 14-2531, 2017 WL 4805202, at *7 (D.N.J. Oct. 25, 2017) ("Because the [Police] Department is not an entity separate from the municipality, it cannot be sued in conjunction with the municipality, *irrespective of the nature of the plaintiff's claims*.") (internal quotations and citations omitted) (emphasis added); *see also Gains*, 2010 WL 760511 (dismissing all claims against the Gloucester City Police Department as an arm of the defendant municipality, including state law claims such as excessive force, negligent supervision, and false imprisonment).

Because Defendant BPD is an administrative arm of the Defendant City, the Court dismisses with prejudice Plaintiffs' Section 1983 claims (Counts I-IV and XIII) as to BPD. Similarly, the Court dismisses with prejudice the remainder of Plaintiffs' New Jersey state law claims (Counts V and VII-XII) as to BPD.

## A. Section 1983/NJCRA Claims

Plaintiffs bring claims under Section 1983 (Counts I-IV, XIII) to remedy alleged violations of the United States Constitution, and claims under the NJCRA (Count V) to remedy alleged violations of the New Jersey Constitution. FAC ¶¶ 13-49, 84-87, 50-54. Plaintiffs' NJCRA claims mirror their Section 1983 claims. *See Id.* Moreover, the NJCRA is interpreted analogously to Section 1983. *Coles v. Carlini*, 162 F. Supp. 3d 380, 404 (D.N.J. 2015) ("[C]ourts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart: Section 1983."). Both parties recognize this. Def. Br. at 18; Pl. Opp'n at 24. Therefore, the Court's 1983 analysis is also applicable to the NJCRA claims.

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 does not provide substantive rights; rather, Section 1983 provides a vehicle for vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). In order to state a claim under Section 1983, a plaintiff must demonstrate that "(1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Burt v. CFG Health Sys.*, No. 15-2279, 2015 WL 1646849, at *2 (D.N.J. Apr. 14, 2015). Plaintiff brings four claims under Section 1983: (1) excessive force in violation of the Fourth Amendment (Count I); (2) false arrest and false imprisonment in violation of the Fourth Amendment (Count II); (3) *Monell* liability for unlawful municipal polices or customs in

violation of the Fourteenth Amendment (Count IV); and (4) loss of consortium in violation of the Fourteenth Amendment (Count XIII).  FAC ¶¶ 13-49, 84-87; Pl. Opp'n at 2-21, 28-29.

### 1. Excessive Force as to Officer Ponik (Count I)

Plaintiffs first bring an excessive force claim in violation of the Fourth Amendment, applied to the states via the Fourteenth Amendment, for Ponik's use of pepper spray during the June 10, 2014 incident.  TAC ¶¶ 13-25.  Defendants argue that the Court should dismiss this claim because Ponik's conduct was reasonable and, therefore, constitutional.  Def. Br. at 4.  Defendants also argue that Ponik is entitled to qualified immunity.  Def. Br. at 7-9.

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "[L]ower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

"The Fourth Amendment, which protects persons from 'unreasonable searches and seizures' prohibits false arrest, false imprisonment, illegal search and seizure, and the use of excessive force.'" *Roman v. City of Newark*, No. 16-1110, 2017 WL 436251, at *3 (D.N.J. Jan. 31, 2017) (quoting U.S. Const. amend. IV).  Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 618 (1988) (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)).  "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment

interests against its promotion of legitimate governmental interests." *Id.* at 619 (quotation marks and citation omitted).

"The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment." *Couden v. Duffy*, 446 F. 3d 483, 496 (3d Cir. 2006). In assessing the validity of an excessive force claim, a court must determine the objective reasonableness of the alleged conduct. *Id.* A court should pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (quoting *Graham*, 490 U.S. at 396). Courts may also consider the following:

> [T]he possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004).

The parties provide little by way of authority as to excessive force vis-à-vis pepper spray. Therefore, the Court conducted its own inquiry. Courts have found an officer's deployment of pepper spray into a rowdy crowd to not run afoul of the Constitution. *See Bramlett v. Champaign Police Dep't*, No. 05-2200, 2006 WL 2710634, at *4 (C.D. Ill. Sept. 20, 2006) (finding that an officer's use of pepper spray into a crowd of 10 to 15 people on a porch where members of the crowd were fighting was reasonable); *Redd v. City of Evansville, Ind.*, No. 12-00070, 2014 WL 2439701, at *7-8 (S.D. Ind. May 30, 2014) (finding no constitutional violation when a police officer, without warning, deployed pepper spray into a crowd of at least six people in a parking lot

where a fight had broken out between two members of the crowd).[4] Other courts have found an officer's use of pepper spray to be potentially excessive when the officer was not trained to use pepper spray, *see Rudolph v. Clifton Heights Police Dep't*, No. 07-01570, 2008 WL 2669290, at *4 (E.D. Pa. July 7, 2008) (finding that a police officer's deployment of pepper spray into a crowd was unreasonable because the officer was not trained in the use of pepper spray), or when the persons sprayed were non-violent protesters, *see Forest Defense v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) (finding a police officer's use of pepper spray on non-violent environmental protestor's eyes and faces during a peaceful protest to constitute excessive force); *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1266 (C.D. Ill. 1996) (denying police officer's motion for summary judgment on plaintiff's excessive force claim when the officer used pepper spray on a crowd of non-violent protesters).

The Court notes that both sides rely heavily on the Attorney General Guidelines on the Use of Force ("AG Guidelines") and the BPD Policy. While these rules may be helpful to the Court in its reasonableness inquiry, they are not dispositive as to the constitutional question. The Court's inquiry is whether Defendants' conduct complied with the Constitution – not with the AG Guidelines or BPD Policy. *See Wade v. Colaner*, No. 06-3715, 2009 WL 1738490, at *4 (D.N.J. June 17, 2009) ("Defendants cannot contend that the protections of the Fourth Amendment are somehow subordinate to the Attorney General's guidelines on the use of force[.]"). Therefore, the Court considers these rules in its analysis but recognizes that they are not dispositive of the constitutional issue.

---

[4] The Court notes that the Southern District of Indiana did not perform a Fourth Amendment analysis in *Redd*, but instead relied on Due Process considerations. *Redd*, 2014 WL 2439701, at *7-8.

Plaintiffs argue that Ponik's conduct was unreasonable because Defendant he was never in danger, as no one was resisting arrest, no one physically struck him, and no one yelled at him. Pl. Opp'n at 6-7. Plaintiffs' focus on Ponik's *own* safety as a justification of his conduct misconstrues the issue before this Court. The issue before this Court is whether Ponik acted reasonably in carrying out his police duties, which, unquestionably involve keeping the *public* safe, not just himself. *See, e.g., Policemen's Benev. Ass'n of New Jersey, Local 318 v. Washington Twp.*, 850 F.2d 133, 136 (3d Cir. 1988) ("Important *public* safety concerns are associated with a police officer's duties.") (emphasis added); *State v. Rodriguez*, 383 N.J. Super. 663, 669 (App. Div. 2006) ("[R]eporting to accident scenes and attending to the safety of the *public* are important parts of any police officer's duties.") (emphasis added); *Wilson v. Podeia*, No. 12-1228, 2013 WL 10054352, at *5 (N.J. Super. Ct. App. Div. Jan. 6, 2015) ("[A] community-caretaking function[] [is] a long recognized essential aspect of a police officer's duties.").

Here, Defendant Ponik came upon a fracas occurring in a narrowly enclosed area involving numerous persons – an obvious threat to public safety and public order. *See* D.E. 59-2. Plaintiffs admit that individuals were fighting within the vestibule, even if "only with their hands, not with weapons." Pl. Opp'n at 9. Of course, persons can inflict serious injury to one another without the aid of implements. Fists alone can inflict serious damage. Further, police officers are not required to wait to take action until weapons (of any sort) are drawn. Here, the Court is not necessarily referring to traditional weapons such as guns or knives, but instead to any object that can be used to injure another. Certain participants in the fracas certainly had access to other objects, such as a phone or the contents of the backpacks. Police officers are not only encouraged – but expected – to intervene before weapons are drawn in order to protect the public and restore order. If Defendant Ponik had not acted swiftly, and someone was seriously injured, Plaintiffs would be arguing he

was derelict in duties for failing to act in a timely manner. Ponik therefore justifiably took action to protect the public and restore order.

Plaintiffs also argue that Ponik's conduct was unreasonable because he deployed the pepper spray at a range closer than three feet. Pl. Opp'n at 9. Plaintiffs cite to the BPD Policy for support, but acknowledge that it refers to a three-foot minimum distance when "target areas include the mouth, eyes, nose, and forehead." *Id.* Here, Defendant Ponik did not spray Peter or Maureen Williams directly on any body part. *See* D.E. 59-2. Plaintiffs concede that Defendant Ponik sprayed it "into the air above the combatants." Pl. Opp'n at 9. Remarkably, Plaintiffs argue that Ponik is now somehow at fault because he did *not* in fact aim the pepper spray directly at their mouth, eyes, nose, or forehead. *Id.* at 9-10. The Court cannot comprehend how taking a less severe action weighs in favor of Plaintiffs' excessive force claim.

Plaintiffs further argue that Defendant Ponik's conduct was unreasonable because he "failed to give appropriate verbal warnings before deploying pepper spray," citing to the BPD Policy for support. *Id.* at 11. Ponik claims that he did in fact yell "Stop it. Stop it. Everybody Stop," before deploying the spray. *Id.*; *see also* D.E. 59-2. The recording does appear to reflect that Ponik's said something before using the spray, but given the lack of audio, the Court is unable to determine what was said. D.E. 59-2. Plaintiffs appear to agree that Ponik said something, Pl. Opp'n at 11, but argue that the purported command was insufficient because Ponik did not identify himself as a police officer or specifically warn that he was going to deploy pepper spray. Yet, the BPD Policy, on which Plaintiffs rely, does not require such warnings in all matters. Instead, the BPD Policy states that an officer "shall, *when practical*, give a verbal warning" before deployment, clarifying that "[n]othing in this procedure shall mandate that an officer give a verbal warning

prior to the application of O.C. Spray if such prior notice would expose the Officer, actor *or another person* to additional danger." Pl. Opp'n at 11 (quoting the BPD Policy) (emphasis added).

More importantly, Plaintiffs fail to cite authority that such warnings were constitutionally required in the circumstances presented. As noted, the Court must view the reasonableness of Ponik's conduct here in light of the facts and circumstances he confronted. As explained above, Ponik came upon a fracas in a tight corridor, where any delay could have resulted injuries to the parties involved or observing. In addition, the facts and circumstances reveal that there was a real danger of escalation if Ponik did not take immediate action. In addition, and again as noted, Ponik did not aim the spray at any person (much less someone's face), instead attempting to spray over the crowd, with a burst of limited duration. Thus, Officer Ponik's use of the spray – regardless of what he actually said when he entered the vestibule – was reasonable under the circumstances.

Plaintiffs further argue that Defendant Ponik's conduct was unreasonable because no arrests were made. Pl. Opp'n at 12. Of course, just because Ponik did not arrest anyone does not mean that he lacked probable cause to charge. At a minimum, Ponik had probable cause to arrest certain individuals within the vestibule for assault under N.J.S.A. 2C:12-1 ("Attempts to cause . . . bodily injury to another"). The fact that Defendant Ponik broke up the situation and decided not to charge individuals does not equate to him having a lack of probable cause to file charges. He had probable cause that crimes were being committed and acted reasonably in stopping them. He also undoubtedly faced a situation in which he had to restore order in a small, enclosed area among a group of individuals, some who were acting in an aggressive manner.

Overall, after viewing the video, the Court concludes that there is no genuine issue of material fact as to Ponik's use of force. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (ruling, after viewing a video recording of an incident, that no genuine issue of material fact existed despite the

parties' offering different views). The vestibule was a small, confined area. Ponik witnessed numerous individuals in the vestibule and many were involved improper conduct, whether it be described as scuffling, pushing, fighting, striking, or shoving. Although at the time no one had drawn a weapon, the reasonable risk that additional objects were available to do damage was obvious in light of backpacks and other objects that the persons had. There was also a real risk of escalation. The physical risk to those involved or present was clear. Defendant Ponik was duty-bound to restore order and clear the vestibule in a constitutionally feasible manner, and he did so.

Defendant Ponik acted reasonably in deploying pepper spray to carry out his police duties of restoring order and clearing the vestibule. Defendant Ponik was trained in the use of pepper spray. Def. SOMF ¶¶ 44-49. Further, this is not a situation where Offer Ponik sprayed non-violent protesters in an open area. As, explained above, this was a fracas in a tightly confined corridor. The Court finds *Bramlett* to be persuasive, as it is most akin to the current situation. Defendant Ponik did not aim the spray at any person specifically – much less anyone's eyes, nose, or forehead. He did not hit Peter directly with the spray. Instead, Ponik deployed a two-second burst into the air, and then moved so that all individuals could exit the vestibule. Therefore, Defendant Ponik acted reasonably in using the pepper spray.[5]

The facts do not indicate that Defendant Ponik used excessive force. Thus, he did not violate Plaintiffs' constitutional rights. Defendant Ponik is entitled to qualified immunity. The Court grants summary judgment to Defendant Ponik on Plaintiffs' Section 1983 excessive force claim.

---

[5] In their opposition, Plaintiffs also argue a "slip of the finger" theory of liability. Pl. Opp'n at 21-22. This theory is inapposite. There is no evidence suggesting that Ponik's discharge of the pepper spray was accidental.

### 2. Excessive Force as to the Remaining Defendants (Remainder of Count I)

Plaintiffs also assert excessive force claims against Chief Scianni, and John Doe Police Officers 1-10. FAC ¶ 22. When more than one officer is sued on a Fourth Amendment excessive force claim, the district court must evaluate each officer's liability separately. *See Kaucher v. Cty. of Bucks*, 455 F.3d 418, n.7 (3d Cir. 2006) ("In order to prevail on a [Section] 1983 claim against multiple defendants, a plaintiff must show that *each* individual defendant violated his constitutional rights." (emphasis added) (quoting *Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005))). It is clear that only Ponik deployed pepper spray in the vestibule. *See* D.E. 59-2. Therefore, alleged constitutional violations against Chief Scianni and John Doe Police Officers 1-10 must be based on either a failure to intervene or supervisory liability. However, because there was no underlying constitutional violation by Ponik, these claims also fail. See *Samoles v. Lacey Twp.*, No. 12-3066, 2014 WL 2602251, at *14 (D.N.J. June 11, 2014) ("In sum, Plaintiffs' § 1983 claims for failure to intervene and supervisory liability necessarily must be dismissed because there is no predicate constitutional violation."). The Court therefore grants summary judgment to the remainder of Defendants[6] on Plaintiffs' excessive force claims under Section 1983 and the NJCRA.

### 3. *Monell* Liability as to the City and Chief Scianni (Count IV)

Plaintiff brings *Monell* liability claims against the City and Chief Scianni for failure to train BPD officers on the use of pepper spray. TAC ¶¶ 39-49. Defendants argue that pre-employment training on pepper spray during the police academy, and BPD mandatory bi-annual trainings on

---

[6] The Court notes that Plaintiffs allege Count I (excessive force under Section 1983) and Count V (violations of NJCRA) against "All Defendants." *See* FAC Count I, Count V. However, Defendant BPD is not liable as an arm of the municipality (as explained above), and Defendant City can only be held liable under a theory of *Monell* liability (as discussed below), see *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978).

pepper spray in accordance with New Jersey Attorney General requirements, sufficiently defeat this claim. Def. Br. at 16. Plaintiffs respond that regardless of the trainings, citizens have filed at least six complaints against officers for improperly using pepper spray between August 2010 and February 2014, constituting a pattern of unremedied wrongful conduct. Pl. Opp'n at 18-19. Defendants reply that these complaints do not indicate wrongful use of pepper spray, as some complainants admit to resisting arrest and striking an officer before use of the spray. Def. Reply at 5.

"A local government may be sued under § 1983 only for acts implementing an official policy, practice or custom." *Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 910 (3d Cir. 1984). This type of municipal liability claim is generally referred to as a "*Monell* claim," based on *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978). *See, e.g., Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 174 (3d Cir. 2017). The *Monell* Doctrine provides "that liability may not be proven under the respondeat superior doctrine, but must be founded upon evidence that the government unit *itself* supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (emphasis added). Yet, when a plaintiff "has not adduced sufficient evidence to establish a dispute of material fact that her constitutional rights were violated, summary judgment is likewise appropriate on her claim against the city for municipal liability under *Monell v. Dep't of Social Servs*." *Graham-Smith v. Wilkes-Barre Police Dep't*, 739 F. App'x 727, 733 (3d Cir. 2018).

Here, as explained above, Plaintiffs have not adduced sufficient evidence to establish a genuine dispute of material fact that their constitutional rights were violated by Ponik's use of pepper spray (or any other conduct attributable to Defendants, as discussed below). Therefore,

Defendants are entitled to summary judgment on Plaintiffs' *Monell* liability claim for failure to train BPD officers on the use of pepper spray (Count IV).

The Court also notes that even assuming, *arguendo*, Ponik's use of pepper spray constituted excessive force, this was still his first excessive force complaint. Def. SOMF ¶ 55. One excessive force complaint does not establish a pattern of constitutional violations typically required for *Monell* liability. *See Anderson v. City of Philadelphia*, No. 16-5717, 2017 WL 550587, at *6 (E.D. Pa. Feb. 10, 2017) ("Even if we took [defendant]'s past incident of misconduct into consideration, two instances of inappropriate conduct do not establish a custom under *Monell*.") (internal citations omitted). Similarly, Plaintiff's "single-incident" failure to train theory (where no pattern of constitutional violations is required), Pl. Opp'n at 20, is unpersuasive. It is true that in some instances, "the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights even without a pattern of constitutional violations." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n. 10 (1989)). However, such "single-incident" claims are extremely difficult to establish, and here BPD officers were required to complete training in the use of pepper spray before joining the force, and twice each year while on the force. Def. SOMF ¶¶ 44-49. Therefore, both of these arguments are unpersuasive.

Plaintiffs' strongest argument for *Monell* liability (again assuming, *arguendo*, that Ponik's conduct amounted to excessive force) seems to be the six prior complaints filed against BPD officers for improper use of pepper spray over the four years preceding the incident. Pl. Opp'n at 18-19. Evidence showing that a municipality "knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers" is sufficient to preclude a municipality from being granted summary judgment on *Monell* liability. *Beck v. City of Pittsburgh*, 89 F.3d 966, 976

(3d Cir. 1996). Citizen complaints can aid in establishing a custom even when a police officer is exonerated, as the complaints nevertheless put the municipality on notice of the conduct. *Worrall v. City of Atl. City*, No. 11-3750, 2013 WL 4500583, at *5 (D.N.J. Aug. 20, 2013). However, the amount of necessary evidence a Plaintiff must present is not subject to precise calculation. *See Katzenmoyer v. Camden Police Dep't*, No. 08-1995, 2012 WL 6691746, at *4 (D.N.J. Dec. 21, 2012) ("Since the *Beck* decision, trial courts in this circuit have grappled with the issue of what type of evidence a plaintiff must adduce in support of a *Monell* municipal liability claim under Section 1983 in order to survive summary judgment.").

Courts in this district have recognized that "statistical evidence alone, isolated and without further context, generally may not justify a finding that a municipal policy or custom authorizes or condones the unconstitutional acts of police officers." *Id.* (quoting *Merman*, 824 F. Supp. 2d at 591) (internal quotations omitted). If a plaintiff wishes to rely on excessive force complaints, "she must show why those prior incidents were wrongly decided and how the misconduct in those cases is similar to that involved in the present action." *Id.* (citing *Franks v. Cape May County*, No. 07-6005, 2010 WL 3614193 at *12 (D.N.J. Sept.8, 2010)). "One way to do this would be to show, as was done in the *Beck* case, that the officer whom a plaintiff accuses of using excessive force has been the subject of multiple similar complaints in the past." *Id.* (referring to *Beck*, where the Third Circuit found that five similar excessive force complaints against defendant officer in less than four years is sufficient to preclude summary judgment on *Monell* liability); *see also Garcia v. City of Newark*, No. 08-1725, 2011 WL 689616 at 3-5 (D.N.J. Feb.16, 2011) (denying defendant municipality's motion for summary judgment on *Monell* liability when plaintiff presented evidence that the six individual defendants together accounted for more than 55 complaints for excessive force and false arrest in the 11 years prior to the incidents at issue). "Alternatively, when such

evidence against the particular officer is not available," courts require more complaints over a shorter time period. *Katzenmoyer*, 2012 WL 6691746, at \*5 (referencing *Merman v. City of Camden*, 824 F. Supp. 2d 581, 591 (D.N.J. 2010), where the district court found that a sample of 40 similar excessive force complaints against different officers over six years was sufficient to preclude a grant of summary judgment on *Monell* liability to defendant municipality).

Here, as explained above, Defendant Ponik has had no prior complaints of excessive force lodged against him. Def. SOMF ¶ 55. Therefore, this case is distinguishable from *Beck*, where the five complaints in four years were all filed against the defendant officer. The Court could not find any decisions in which the evidence presented here – six similar complaints of excessive force for the improper use of pepper spray by different officers over a four-year period – is sufficient to overcome summary judgment on a *Monell* claim. Plaintiffs did not cite any such authority. However, in light of the Court's ruling that no constitutional violation occurred, causation would nevertheless fail.

Regarding causation, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). Here, the causal link is broken because Ponik did act unconstitutionally. For the foregoing reasons, the Court grants summary judgment to Defendants on Plaintiffs' *Monell* liability claim.

### 4. False Arrest/Imprisonment (Count II)

As to Plaintiffs' false arrest and false imprisonment claims, Defendants argue that the Court should dismiss the claims because Plaintiffs were neither arrested nor detained. Def. Br. at 10. Plaintiffs respond Defendant Ponik restrained Peter and Maureen Williams in the vestibule against

their will. Pl. Opp'n at 27. Of note, Plaintiffs previously argued that the excessive force claims should stand because, in part, no arrests were made.

Regarding false arrest, "[a]n arrest made without probable cause creates a cause of action for false arrest under 42 U.S.C. § 1983." *O'Connor v. City of Philadelphia*, 233 F. App'x 161, 164 (3d Cir. 2007) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)). Additionally, "where the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *Id*. (citing *Groman*, 47 F.3d at 636. "Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002). In determining whether a police officer had probable cause to arrest, a court must review the totality of the circumstances of the events leading up to the arrest and must do so from the "standpoint of an objectively reasonable police officer[.]" *Id*. (citation omitted).

Regarding false imprisonment, "[a] plaintiff may assert a § 1983 claim for unlawful detention, also referred to as false imprisonment, under both the Fourth and Fourteenth Amendment." *Potts v. City Of Philadelphia*, 224 F. Supp. 2d 919, 936 (E.D. Pa. 2002). A false imprisonment claim based on the Fourth Amendment requires "an arrest made without probable cause." *Groman*, 47 F.3d at 636. When a plaintiff suffers a false arrest, the plaintiff may have also suffered "a violation of his constitutional rights by virtue of his detention pursuant to that arrest." *Id*. "The Supreme Court suggested in *Baker* that prolonged detention in the face of a person's protestation of innocence may violate the Fourteenth Amendment" as well, meaning a plaintiff can sustain a claim for false imprisonment under Section 1983 without a false arrest. *Id*.

(referencing *Baker v. McCollan*, 443 U.S. 137, 143 (1979)). However, the Court went on to hold that detention for three days "does not and could not amount to such a deprivation." *Id.* (quoting *Baker*, 443 U.S. at 143).

Here, no Plaintiff was arrested in connection with this incident. Therefore, Plaintiffs' Section 1983 false arrest claim must fail. As to false imprisonment, Plaintiffs seem to be arguing that while Ponik deployed the pepper spray, he blocked the doorway to the vestibule for a few seconds, falsely imprisoning Maureen and Peter. Pl. Opp'n at 27. Yet, Plaintiffs have presented no authority to support that such action amounts to false imprisonment for constitutional purposes. Therefore, Plaintiffs' Section 1983 false imprisonment claim fails as well.

### 5. Loss of Consortium (Count XIII)

Jamie asserts that Defendants violated her Fourteenth Amendment rights by depriving her of her Peter's services. Pl. Opp'n at 28-29. Plaintiffs cite to *Pahle v. Colebrookdale Twp.*, 227 F. Supp. 2d 361, 380 (E.D. Pa. 2002), where the Eastern District of Pennsylvania stated, "[w]e believe that in the Third Circuit, a spouse may assert a claim under § 1983 that the government improperly interfered with her personal right to the services, society and companionship of her husband (i.e., consortium), denying her Due Process of law, to which she is entitled under the Fourteenth Amendment." *Id.* at 28. Defendants respond that the Third Circuit has "merely suggested that a spouse may allege a loss of consortium claim under Section 1983, but that the Third Circuit ha[s] never directly confronted the question." Def. Reply at 11-12. Defendants also argue that the undisputed facts show that Plaintiff has not suffered any loss in services or companionship from her husband given that his life expectancy at the time of the incident was less than one year, and additionally that Plaintiffs' loss of consortium claim cannot be maintained because it is a derivative

claim that depends on the existence of another valid claim – which Defendants allege is lacking. Def. Reply at 10-11.

Although the Third Circuit has yet to definitively rule on the issue, other courts in this District have not recognized a loss of consortium claim under Section 1983. *See Love v. New Jersey State Police*, No. 14-1313, 2016 WL 3046257, at *9 (D.N.J. May 26, 2016) ("'[T]here exists no constitutional interest in the consortium of one's spouse' and therefore, 'such a claim cannot sustain an action pursuant to § 1983.'") (quoting *Pagan v. Twp. of Raritan*, Civ. No. 04-1407, 2006 WL 2466862 (D.N.J. Aug. 23, 2006)); *see also Norcross v. Town of Hammonton*, No. 04-2536, 2006 WL 1995021, at *3 (D.N.J. July 13, 2006) ("This Court now finds that there exists no constitutional interest in the consortium of one's spouse and deigns to create such a right."). At a minimum, it is not clear that Section 1983 includes a loss of consortium claim.

However, even if such a claim was valid under Section 1983, "[l]oss of consortium claims are derivative claims that are contingent upon the success of the spouse's related substantive claim." *Keller v. M & M Bail Bonds Inc.*, No. 17-1524, 2017 WL 2734715, at *6 (D.N.J. June 26, 2017) (citing *Acevedo v. Monsignor Donovan High Sch.*, 420 F. Supp. 2d 337, 347 (D.N.J. 2006)). Here, as explained, the Court finds that no constitutional violations occurred. Therefore, Jamie Williams' loss of consortium claim also fails. The Court grants summary judgment to Defendants on Plaintiffs' Section 1983 loss of consortium claim.

**B. State Law Tort Claims**

Plaintiffs also assert a number of New Jersey state law tort claims against Defendants. FAC ¶¶ 55-83. Such claims are subject to the New Jersey Tort Claims Act ("TCA"), N.J.S.A. 59:1-1 *et seq*. Under TCA Section 59:3-3, "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." N.J.S.A. § 59:3-3. The TCA provides, however, that

"[n]othing in this section exonerates a public employee from liability for false arrest or false imprisonment." N.J.S.A. § 59:3-3. "In false arrest/false imprisonment cases, the only relevant inquiry is whether, on an objective basis, the police officer's actions were proper." *DelaCruz v. Borough of Hillsdale*, 183 N.J. 149, 153-54 (2005). Hence, "[s]ummary judgment under section 59:3–3 is appropriate if a public official establishes that his or her 'acts were objectively reasonable or that they performed them with subjective good faith.'" *Nicini v. Morra*, 212 F.3d 798, 815 (3d Cir. 2000) (quoting *Canico v. Hurtado*, 144 N.J. 361, 365, 676 A.2d 1083, 1085 (1996)).

Here, the Court has already determined that Ponik acted in an objectively reasonable manner. Therefore, he is shielded from liability for Plaintiffs' New Jersey state law tort claims and is entitled to summary judgment. The Court nonetheless conducts an analysis of each claim in particular below.

In addition, there are two TCA provisions that govern a public entity's liability for conduct of an employee. Under Section 59:2-2(b), public entities are not liable for "an injury resulting from an act or omission of a public employee where the public employee is not liable." N.J.S.A. § 59:2-2(b). Additionally, under Section 59:2-10, public entities are not liable for "the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J.S.A. § 59:2-2(b). Here, Ponik's conduct was not tortious (as explained above and below); therefore, the City is not liable for any injury resulting from it, and is entitled to summary judgment on Plaintiffs' New Jersey state law tort claims.

Finally, Section 59:9-2(d) contains a "verbal threshold requirement" for when plaintiffs allege damages for pain and suffering; the section provides as follows:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily

> function, permanent disfigurement or dismemberment where the
> medical treatment expenses are in excess of $3,600.00.

N.J.S.A. § 59:2-2(b); *see also DelaCruz*, 183 N.J at 162 (referring to this subsection as the "verbal threshold requirement"). "[T]he Tort Claims Act's verbal threshold [also] applies to common law false arrest/false imprisonment claims." *DelaCruz*, 183 N.J at 153. The only exceptions to the verbal threshold requirement are "actual fraud, actual malice or willful misconduct." *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 584 (2009) (citing N.J.S.A. 59:3–14(a)).

As Defendants point out, Plaintiff Maureen Williams did not suffer any permanent injury or present any evidence that she incurred medical treatment expenses in excess of $3,600.00. Def. Br. at 11, 22. The same applies for Plaintiff Jamie Williams, who was not present at the incident. Plaintiffs appear to recognize this deficiency, arguing that Maureen's emotional distress are compensable damages for the constitutional excessive force violation. Pl. Opp'n at 22-23. As noted above, however, the Court is granting summary judgment to Defendants as to the alleged excessive force. Therefore, the Court grants summary judgment to Defendants on all of Plaintiffs' damages claims for pain and suffering.

### 1. False Arrest/Imprisonment (Count VII)

Plaintiffs bring a claim under New Jersey law for false arrest and imprisonment. TAC ¶¶ 60-62. Defendants reiterate their argument as to the Section 1983 false arrest and imprisonment claims, and argue that Plaintiffs have not met the TCA verbal threshold requirement. Def. Br. at 10-12. Although not entirely clear, the Court assumes that Count VII refers to common law false arrest and imprisonment.

In New Jersey, "false arrest and false imprisonment are not separate torts; they are different names for the same tort." *Rasmussen v. United States*, No. 14-6726, 2015 WL 9581874, at *4 (D.N.J. Dec. 30, 2015) (citing *Price v. Phillips*, 90 N.J. Super. 480, 484 (App. Div. 1966)); *see*

*also DelaCruz v. Borough of Hillsdale*, 183 N.J. 149, 153 (2005). This common law tort requires "an arrest or detention of the person against his or her will; and lack of proper legal authority or 'legal justification." *Id.* (citing *Mesgleski v. Oraboni*, 330 N.J. Super. 10, 24 (App. Div. 2000)). "[U]nder N.J.S.A. 59:3-3, a police officer's subjective good faith belief as to the propriety of his/her actions is irrelevant as to liability for any false arrest or false imprisonment claims." *DelaCruz*, 183 N.J. at 153. Instead, "[i]n false arrest/false imprisonment cases, the only relevant inquiry is whether, on an objective basis, the police officer's actions were proper." *Id.* at 153-54.

Here, as explained above, Defendant did not arrest or detain any Plaintiffs. Moreover, the Court has already determined that Ponik's actions were objectively reasonable. Further, Plaintiffs present no authority, nor could the Court find any, to support a claim of common law false arrest or imprisonment under the circumstances here. While Defendant Ponik did stand in the doorway of the vestibule for a moment, no one was trying to leave at that point. *See* D.E. 59-2. To the contrary, Ponik was attempting to clear the vestibule. As Plaintiff Maureen Williams concedes, she did not even know that Defendant Ponik was present in the vestibule until after he deployed the pepper spray. Def. SOMF ¶ 16. Further, immediately after deploying the pepper spray, Defendant Ponik moved aside so that the occupants of the vestibule could exit. *See* D.E. 59-2. In fact, it appears that Defendant Ponik even ushered individuals *out* of the vestibule through arm signaling, physical assistance, and holding open the door. *See id.* The Court grants Defendants summary judgment on Plaintiffs' common law false arrest/imprisonment claim.

## 2. Negligence and Gross Negligence (Counts VIII & IX)

Plaintiffs bring claims for negligence and gross negligence against Ponik for his use of the pepper spray, FAC ¶¶ 66, 70, and the City, BPD, and Chief Scianni for an alleged failure to properly train Defendant Ponik, *id.* ¶¶ 67, 70. Defendants assert that Ponik acted reasonably, and

the other Defendants cannot be held liable because Defendant Ponik is not liable for any underlying violation (in addition to the TCA "verbal threshold" arguments addressed above). Def. Br. at 21-22.

Even though Plaintiffs' constitutional claims fail, Plaintiffs may still attempt to bring common law tort claims based on the same conduct. *See Baker*, 443 U.S. at 146 ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought . . . under traditional tort-law principles."). "Negligence involves a breach of a duty of care that causes injury." *Roccisano v. Twp. of Franklin*, No. 11-6558, 2013 WL 3654101, at *11 (D.N.J. July 12, 2013) (citing *Weinberg v. Dinger*, 106 N.J. 469, 484 (1987)). Thus, "to succeed on a negligence claim, a plaintiff must show: (1) a duty of care, (2) a breach of that duty, (3) causation, and (4) actual damages." *Id.* (citing *Weinberg*, 106 N.J. at 484). Specifically, police officers "have a duty to act reasonably, and, in the context of effectuating an arrest, they have a duty to exercise 'reasonable care to preserve the life, health, and safety of the person in custody.'" *Id.* (citing *Del Tufo v. Township of Old Bridge*, 147 N.J. 90, 101 (1996)). "With regard to a claim of gross negligence, the difference between gross and ordinary negligence is one of degree rather than of quality." *Smith v. Kroesen*, 9 F. Supp. 3d 439, 442 (D.N.J. 2014) (quoting *Fernicola v. Pheasant Run at Barnegat*, 2010 WL 2794074, *2 (N.J. Super. Ct. App. Div. July 2, 2010)) (internal quotations omitted). "Gross negligence refers to behavior which constitutes indifference to consequences." *Id.* (quoting *Griffin v. Bayshore Medical Center*, 2011 WL 2349423, *5 (N.J. Super. Ct. App. Div. May 6, 2011)).

Here, as explained above, Defendant Ponik acted in an objectively reasonable manner when he used the pepper spray. Because Ponik did not breach his duty to act reasonably, the

negligence claim fails. Because Ponik was not negligent, the more demanding gross negligence counts also falls, and the City and Chief Scianni are not liable for any alleged negligence in failing to train him. The Court grants Defendants summary judgment on Plaintiffs' negligence and gross negligence claims.

### 3. Wrongful Death and Survival Action (Counts X & XI)

Plaintiffs also assert a wrongful death and survival action claims. FAC ¶¶ 72-79. Defendants argue that such actions are inappropriate because Defendants did not cause Peter's death. Def. Br. at 22, 24. Plaintiffs insist that a causal connection exists, relying on their own experts. Pl. Opp'n at 26.

New Jersey's Survivor's Act, N.J.S.A. 2A:15-3, "permits, for the benefit of the decedent's estate, an appointed representative to file any personal cause of action that *decedent* could have brought had he lived." *Aronberg v. Tolbert*, 207 N.J. 587, 593 (2011) (emphasis added). "In other words, the survival action preserves the right of action which the deceased himself would have had to redress his own injuries." *Id.* (internal quotations omitted). In contrast, New Jersey's Wrongful Death Act, N.J.S.A. 2A:31-1, *et. seq.*, "provides to decedent's heirs a right of recovery for pecuniary damages for *their* direct losses as a result of their relative's death due to the tortious conduct of another." *Id.* (emphasis added); *Capone v. Nadig*, 963 F. Supp. 409, 414 (D.N.J. 1997) ("Unlike a survival action which seeks to compensate the estate for the pain and suffering of the decedent prior to death, a wrongful death action under N.J.S.A. § 2A:31–1, *et seq.*, seeks to compensate for the pecuniary loss that the survivors suffer as a result of the death of the decedent."). Damages in a wrongful death action may include "the loss of expected financial contribution and the pecuniary loss of future services, companionship and advice." *Id.* (citing *Green v. Bittner*, 85 N.J. 1, 12 (1980)). Yet, "[c]ompanionship and advice in this context must be

limited strictly to their pecuniary element." *Id.* "In other words, to be compensable, companionship lost by death must be that which would have provided services substantially equivalent to those provided by the 'companions' often hired." *Id.* (internal quotations omitted). "No pecuniary value may be attributed to purely emotional loss." *Id.*

Here, both Plaintiffs' wrongful death and survival action fail because Plaintiffs have not established (1) any underlying violation that Peter could have used to redress his own injuries had he lived, or (2) any underlying tortious conduct the other Plaintiffs can rely on to redress their own direct losses. There are no genuine disputes of material fact as to underlying wrongful conduct that would permit the claims to proceed. The Court grants summary judgment in favor of Defendants on Plaintiffs' wrongful death and survival action claims.

### 4. IIED & NIED (Count XII)

Plaintiffs bring an IIED claim against Defendants. TAC ¶¶ 80-83. Defendants first argue that the City of Bayonne and BPD are immune from intentional tort liability pursuant to N.J.S.A. 59:2-10 (in addition to the TCA "verbal threshold" argument addressed above). Def. Br. at 27.

Under New Jersey law, a claim for IIED requires a plaintiff to show the following:

> (1) that the defendant acted intentionally or recklessly, both in doing the act and in producing emotional distress; (2) that the defendant's conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency; (3) that the defendant's actions were the proximate cause of the emotional distress; and (4) that the emotional distress suffered was so severe that no reasonable person could be expected to endure it.

*Smith v. Exxon Mobil Corp.*, 374 F. Supp. 2d 406, 422 (D.N.J. 2005) (quoting *Wigginton v. Servidio*, 324 N.J. Super. 114, 130 (App. Div. 1999)). "In judging the plaintiff's reaction or emotional distress, mere allegations of aggravation, embarrassment, an unspecified number of

headaches, and loss of sleep, may be insufficient as a matter of law." *Id.* at 423 (quoting *Wigginton*, 324 N.J. Super. at 132) (internal quotations omitted).

Here, as explained above, the Court finds Defendant Ponik to have acted reasonably. This means that his conduct was not "was so outrageous in character and extreme in degree as to go beyond all bounds of decency." Therefore, he cannot be liable for IIED to Plaintiffs. Since Defendant Ponik is not individually liable, the remaining Defendants also cannot be held liable. Additionally, since this is an intentional tort, the remaining Defendants could not be held liable even if Defendant Ponik's conduct reached this requisite standard of outrageous.

Plaintiffs also bring an NIED claim against Defendants. TAC ¶¶ 80-83. New Jersey law recognizes two forms of NIED claims: (1) "zone of danger claims" and (2) "*Portee* claims." *In re Paulsboro Derailment Cases*, No. 13-784, 2013 WL 5530048, at *6 (D.N.J. Oct. 4, 2013) (hereinafter "*Paulsboro*") (citing *Jablonowska v. Suther*, 195 N.J. 91, 104 (2008)). The "zone of danger" form occurs when "the defendant's negligent conduct placed the plaintiff in reasonable fear of immediate personal injury, which gave rise to emotional distress that resulted in a substantial bodily injury or sickness." *Id.* (quoting *Jablonowska*, 195 N.J. at 104). This requires the plaintiff to have been "presen[t] within [the] zone of danger" and "usually involves a plaintiff who narrowly escaped a reasonably apprehended physical impact as a result of a defendant's negligent conduct." *Id.* (quoting *Jablonowska*, 195 N.J. at 103) (internal quotations omitted).

The "*Portee* claim" gets its name from the New Jersey Supreme Court's decision in *Portee v. Jaffee*, 84 N.J. 88 (1980). This claim is "for emotional damages caused by a plaintiff witnessing the death or serious bodily injury of a spouse or close family member." *Paulsboro*, 2013 WL 5530048, at *6 (citing *Jablonowska*, 195 N.J. at 103). However, "[t]he plaintiff must have a

'sensory and contemporaneous observation of the death or injury' at the scene where it took place and must suffer severe emotional distress as a result." *Id.* (quoting *Jablonowska*, 195 N.J. at 103).

Here, Plaintiff Jamie Williams meets neither scenario – she was not in the zone of danger and she did not witness the event. Therefore, only Plaintiff Maureen Williams can assert these NIED claims, as she was in the vestibule at the time the pepper spray was deployed and contemporaneously witnessed it. Yet, as noted, the Court does finds that Defendant Ponik was not negligent; there are no genuine disputes of material fact to the contrary. The Court grants summary judgment to Defendants on Plaintiffs' IIED and NIED claims.

### C. Motions in Limine

Both parties have filed motions in limine seeking to exclude testimony of each other's expert witnesses. D.E. 61, 70.[7] Because the Court is granting summary judgment in favor of Defendants, the Court finds these motions to be moot.

## V. CONCLUSION

Peter Lee Williams' death, regardless of the cause, was tragic. However, Defendants must still be potentially liable for this matter to proceed to trial. As discussed, because there are no genuine issues of material fact, Plaintiffs' claims fail. For the reasons set forth above, Defendants' motion for summary judgment (D.E. 59) is granted. The parties' motions in limine (D.E. 61, 70) are dismissed as moot. An appropriate Order accompanies this Opinion.

Date: January 11, 2019

John Michael Vazquez, U.S.D.J.

---

[7] This Court's practice is to address motions in limine only after the Court's final pretrial order is entered. No final pretrial order has been entered in this matter, so the motions in limine were premature.